Marion J. WOODS, Director of the State
Department of Social Services,
Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 83–1659.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 15, 1983.

Decided Feb. 3, 1984.

John J. Klee, Jr., Deputy Atty. Gen., San Francisco, Cal., for plaintiff-appellant.

Carlene V. McIntyre, Dept. of Justice, Washington, D.C., for defendant-appellee.

Before DUNIWAY, KENNEDY, and ALARCON, Circuit Judges.

ALARCON, Circuit Judge:

This is an appeal from the judgment of the district court granting the United States Department of Agriculture's (USDA) motion for summary judgment in an action brought by the California Department of Social Services to challenge the decision of the Food Stamp Appeals Board upholding the USDA's claim in the amount of $234,842.00, for violations of the Food Stamp Act of 1964 during the period of November 15, 1976 to May 31, 1977.

We must decide: (1) whether the Secretary of Agriculture may recover from the State of California losses to the Federal Treasury caused by San Francisco when it shifted its welfare burden to the federal government; (2) whether the Secretary is estopped from asserting his claim against the state because of his failure to join in state court proceedings brought by welfare recipients challenging San Francisco's actions; (3) whether the district court erred in determining that the damages suffered by the federal government were properly calculated. We find that the Secretary has an implied right of action under section 10(d) of the Food Stamp Act to recoup losses stemming from misuse of the food stamp program, that the state is responsible for San Francisco's misfeasance causing those losses, that the Secretary is not estopped from asserting a claim in federal court under procedures set forth in the Food Stamp Act, and that the damages were properly calculated. We affirm the judgment of the court below.

## FACTUAL BACKGROUND

The facts underlying the USDA's claim against the state were not in dispute. Accordingly, the case was decided by the dis-

trict court upon cross-motions for summary judgment.

Eligibility under the Food Stamp Act of 1964 [1] was governed by standards established by the Secretary of Agriculture. 7 U.S.C. 2014(b). States desiring to participate in the program were required to assume the responsibility for the certification of applicant households and for the issuance of coupons. 7 U.S.C. 2019(b). In addition to paying all the benefit costs, the United States reimbursed the states for 62½% of the state administrative costs. 7 U.S.C. 2024(b). The states were required to reimburse the United States for coupons issued as a result of gross negligence or fraud. 7 U.S.C. 2019(g). The states were, in turn, permitted to delegate some of the duties associated with the administration of the program to local governments. 7 U.S.C. § 2019(e).

California statutes require each of the state's 58 counties to have a General Assistance Program (GA) to provide relief to indigents not covered by any of the federal state categorical welfare programs. Cal. Welfare and Inst.Code Sections 17000 *et seq.* and Sections 18450 *et seq.* The funding and operation of the programs are left to the individual counties each of which sets its own level of GA payments.

In 1976, the California Court of Appeals upheld a Superior Court order finding that levels of aid extended by San Francisco to its indigents fell far below all recognized indices of minimum poverty standards. *City and County of San Francisco v. Superior Court,* 57 Cal.App.3d 44, 48, 128 Cal.Rptr. 712 (1976).

On November 13, 1976, San Francisco determined that individual assistance levels should be recalculated. In setting the new level at $149, the Board of Supervisors took into consideration the fact that the GA recipients were eligible to participate in the federal-state food stamp program. Both welfare recipients and the U.S. Department of Agriculture promptly challenged the county's welfare ordinance as violative of the Food Stamp Act.

In *Long v. City and County of San Francisco,* 78 Cal.App.3d 61, 144 Cal.Rptr. 64 (1978), the state court of appeals invalidated the ordinance, holding that it violated federal and state statutes expressly prohibiting the reduction of public assistance benefits on account of food stamp purchases. During the course of the class action against San Francisco, a fund of money was placed in Court from which all damages arising out of San Francisco's failure to pay adequate GA benefits were to be paid. The USDA was invited to appear and assert any claim it might have for damages. The USDA chose not to press its claim against California in the state court proceedings.

After a review of the *Long* decision, the USDA decided that if San Francisco had paid the required GA benefit, the recipients' income would have been higher and, consequently, they would have had to pay more for their food stamps. Under the 1964 Act, the purchase price for food stamps was determined by the recipient's "income" level—the lower the recipient's income, the lower the purchase price. Since the cost of the food stamp program was borne entirely by the federal government, the USDA concluded that it had been financially damaged by San Francisco's underpayment of GA benefits during the period in question.

The USDA then made demands upon the state for reimbursement of those losses. On June 19, 1979, Agriculture sent a letter to the state claiming $902,608 as a "conservative estimate" of the program losses. On July 1, 1980, the USDA adjusted the claim to cover only those abuses occurring during the period covered in the original audit. The amount claimed was reduced to $396,-802. In making this estimate of damage, the USDA auditors assumed that even if the recipients had received the higher amount of assistance, their shelter costs would have remained the same.

---

1. While the Food Stamp Act of 1964 has been replaced by the Food Stamp Act of 1977, the events underlying this claim arose during the effective period of the 1964 Act. The 1964 Act is therefore generally controlling. *See, e.g., California v. Block,* 663 F.2d 855, 858–59 n. 3 (9th Cir.1981).

On October 21, 1980, the USDA reasserted its claim and notified the state of its right to administrative appeal. The state appealed and on May 4, 1981, the Food Stamp Appeals Board upheld the USDA's determination. On June 3, 1981, the state filed a complaint in district court challenging the Board's decision.

The district court agreed with USDA's position that the State of California was liable for San Francisco's violation of the Food Stamp Act. The court did grant the state partial relief, finding that the USDA failed to produce substantial evidence that the GA level prior to the time the violative rates took effect "followed a scheme in violation of the Food Stamp Act." Accordingly, the court denied the federal government's claim for that period and reduced the state's liability from $396,802 to $234,842. The court rejected the state's challenge that USDA's estimate of loss was overstated because its calculations did not take into consideration any potential rise in shelter costs.

## I.

## CAN THE FEDERAL GOVERNMENT BRING AN ACTION AGAINST THE STATE FOR A VIOLATION OF SECTION 10(d)?

### A. *Has section 10(d) been Violated?*

■ As a threshold challenge, the state questions whether an impermissible reduction in general assistance payments constitutes a violation of the Food Stamp Act.

Compliance with section 10(d) (7 U.S.C. § 2019(d)) is a condition of the state's participation in the food stamp program. 7 C.F.R. 272.1 (1976). While San Francisco did not directly misspend food stamp funds, it caused food stamp funds to be misspent by collecting less than the appropriate purchase price for the stamps. In *Long,* the court found expressly that the Board of Supervisors impermissibly took food stamps into account in computing the general assistance benefit package. *Long v. City and County of San Francisco,* 78 Cal.App.3d 61, 72, 144 Cal.Rptr. 64 (1978).

San Francisco clearly violated section 10(d) of the Food Stamp Act. The inclusion of $42 of presumed eligibility for food stamps within its general assistance scheme represented an attempt by San Francisco to shift its welfare burden to the United States.

### B. *Is it a State Violation?*

The state argues that it may not be held liable for the losses incurred by San Francisco's violation of the Food Stamp Act. It claims that San Francisco operates its General Assistance program independent of any control by the State of California, and thus that any action to recoup misspent funds under section 10(d) must be brought against San Francisco.

■ The Food Stamp Act places responsibility for the administration of the food stamp program on the state. It is the state that must request participation of the program under 7 U.S.C. 2013(a) (1976). The state must also agree with the Secretary on a plan for the lawful and effective operation of the program. 7 U.S.C. 2019(e) (1976); Cal.Welf. & Inst.Code § 18903. While the state may choose to delegate some administrative responsibilities, 7 U.S.C. 2019(b) (1976); Cal.Welf. & Inst. Code § 18902 (West 1980), "the ultimate responsibility for operation of the plan remain[s] with the state." *California v. Block,* 663 F.2d 855, 858 (9th Cir.1981). *See also* H.R.Rep. No. 95–464, 95th Cong., 1st Sess. 388–91 (1977), *reprinted in* [1977] U.S. Code Cong. & Ad.News 1971, 2317–20 (discussing instances of state liability for local error under 1964 Act). Section 10(d) of the Food Stamp Act of 1964 provides:

Participating States or participating political subdivisions thereof shall not decrease welfare grants or other similar aid extended to any person or persons as a consequence of such person's or persons' participation in benefits made available under the provisions of this chapter or the regulations issued pursuant to this chapter.

Under section 10(d), California had the power to permit local governmental units to administer the program, but it could not delegate its ultimate responsibility to com-

ply with the requirements of the Act. As the court below pointed out, "[i]f plaintiff's analysis is taken to its logical extreme, all State responsibility would, by virtue of the delegation, be effectively abrogated."

The state also argues that a distinction must be made between the operation of the food stamp program and the operation of the general assistance program.

Any such distinction does not change the result in the present case. San Francisco acts as an agent of the state even when it is administering the general assistance program alone. *See Long v. City and County of San Francisco,* 78 Cal.App.3d at 68, 144 Cal.Rptr. 64. Also, there is a strong interaction between the two programs: California incorporated the federal food stamp program into the general assistance program. *Long v. City and County of San Francisco,* 78 Cal.App.3d at 71, 144 Cal. Rptr. 64. The state code parallels section 10(d). Cal.Wel. & Inst.Code § 18908.

The Food Stamp Act violation was central to the county's benefit package scheme. Even if we assume that the state was not generally responsible for San Francisco's administration of the GA program, California was responsible for the impact of general assistance on the food stamp program.

■ We conclude that the State of California, is fully responsible for the violation of section 10(d).

C. *Does the Absence of Specific Statutory or Regulatory Authority Preclude the Federal Government from Bringing an Action Against the State?*

The state argues that a violation of section 10(d) of the Act does not give rise to a cause of action in the USDA. The state points to what it feels is a "conspicuous absence" of any express statutory language which authorizes the USDA to recover damages due to a violation of section 10(d).

■ The district court held that a cause of action accrued in favor of the USDA for the violation of section 10(d). The court below also found that the state had been grossly negligent in its management of the food stamp program, in violation of section 10(g) of the Act. In that we find that the government can seek reimbursement through an implied cause of action under section 10(d), we need not determine whether the USDA's claim can also be sustained under section 10(g).

The Secretary was granted broad authority to administer the Food Stamp Act. 7 U.S.C. 2013(c) (1976). This section provided that the Secretary "shall issue such regulations, not inconsistent with this chapter, as he deems necessary or appropriate for the effective and efficient administration of the food stamp program." The state points out that even if the Secretary's rule-making powers allowed the enactment of a regulation making the states liable for damages to the USDA for a violation of section 10(d), no such regulation has been adopted.

■ We believe that the absence of a specific regulation does not affect the Secretary's common law right to recoup from the state for damages caused by a violation of section 10(d). The government has the authority to recover funds which its agents have wrongfully, erroneously or illegally paid. No statute is necessary to authorize the United States to sue in such a case. *United States v. Wurts,* 303 U.S. 414, 415, 58 S.Ct. 637, 638, 82 L.Ed. 932 (1938).

This circuit has also recognized that the government has a common law right to recover overpayments. *United States v. Mead,* 426 F.2d 118, 124 (9th Cir.1970). For example, we have held that under the CETA program the government is entitled to recover misappropriated funds from municipal governments. *Cf. City of Oakland v. Donovan,* 703 F.2d 1104 (9th Cir.1983).

■ The choice between proceeding by general rule or by individual, ad hoc litigation to recoup damages, is one that lies primarily in the informed discretion of the administrative agency. *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). While our circuit has looked with disfavor on agency action which changes existing regulations in an adjudicative setting and establishes rules of widespread application, we have held that an agency may enforce violations of exist-

ing laws through adjudication. *See Ford Motor Co. v. FTC,* 673 F.2d 1008, 1009 (9th Cir.1981), *cert. denied,* 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 394 (1982).

A number of other circuits have addressed the availability of a common law recoupment power as well. In *Jacquet v. Westerfield,* 569 F.2d 1339, 1345 (5th Cir. 1978), the Fifth Circuit held that the power to disqualify food stamp recipients on account of fraud was "inherent in the effective administration of such a program." At issue in *Jacquet* was a disqualification regulation, but the court noted that "[n]ot only is recoupment an appropriate administrative tool, but the government also has a common law right to recoup value fraudulently obtained from it." *Jacquet* at 1346.

Other circuits have reached conclusions similar to ours in cases dealing with the government's recovery of overpayments under other statutes. *See, e.g., Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger,* 517 F.2d 329 (5th Cir.1975), cert. denied, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976) dealing with Medicare overpayments; *State of West Virginia v. Secretary of Education,* 667 F.2d 417 (4th Cir.1981), dealing with overpayments of funds under Title I of the Elementary and Secondary Education Act; *Collins v. Donovan,* 661 F.2d 705 (8th Cir.1981) recoupment by Department of Labor of overpaid readjustment allowances.

It is evident to us, based on the authority cited above, that the government also had the implied power to recover funds spent in violation of the express terms and conditions of the grant for breach of contract.

■ There is ample authority for the characterization of the relationship between the USDA and the states under the food stamp program as contractual. The Supreme Court has said: "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State School v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981). The government has the right to make contracts and hold and dispose of property, and, for the protection of its property rights, resort to the same remedies as a private person. *Rex Trailer Co. v. United States,* 350 U.S. 148, 151, 76 S.Ct. 219, 221, 100 L.Ed. 149 (1956).

■ The specific remedy incorporated into section 10(g) permitting damages for gross negligence in the certification of applicant households does not limit the government from bringing an action to recoup for a violation of section 10(d). Section 10(g) concerns certification of household and issuance violations only. According to the Senate Report, the intent behind the enactment of section 10(g) was "to impress upon the States the equal responsibility they share with the Federal Government for limiting the program to those households of low income which cannot afford to purchase a low-cost, nutritionally adequate diet." S.Rep. No. 1124, 88th Cong., 2d Sess. (1964), *reprinted in* U.S.Code Cong. & Ad. News, 3275, 3286 (1964). The Senate thought that section 10(g) sufficed to create the desired incentives for careful and efficient administration of the program while at the same time providing a sanction that was not so severe as to deter states from certifying deserving recipients. *State of California v. Block,* 663 F.2d 855, 858 n. 3 (9th Cir.1981).

The violation in the instant case did not involve a discretionary judgment by the state as to the certification of any particular household. Rather, the San Francisco general assistance scheme caused an across-the-board miscalculation of food stamp benefits with respect to numerous recipients.

As the Fifth Circuit pointed out in *Mount Sinai Hosp. of Gr. Miami, Inc. v. Weinberger,* 517 F.2d 329, 338 (5th Cir.1975),

the recoupment right does not always fit consistently and logically into the statutory system, but the alternative of no right to recoup produces even more severe incongruities. Provisions apparently contrary to the government's right to recoup serve important functions that complement rather than displace or supersede the recoupment right.

In *Hettleman v. Bergland,* 642 F.2d 63 (4th Cir.1981), the court held that the Secretary did not exceed his authority under the Food Stamp Act of 1964 by promulgating a regulation under which strict liability for loss of food stamps was imposed on the states. The state of Maryland had challenged the standard of care imposed as being inconsistent with another provision of the Act. The court found that the contested regulation was "a valid and reasonable exercise of the Secretary's § 2013 authority to administer the Act effectively ... [which] places responsibility for loss on the party in the best position to protect against it ..." *Hettleman* at 67.

The logic of the *Hettleman* court, that such a standard might be necessary in order to allow the Secretary to administer the Act effectively, applies equally to the common law recoupment power. For example, the challenged overpayment in *Collins v. Donovan, supra,* was caused by an error in the department's computation and was in no way the fault of Collins. The absence of fault by the plaintiff did not preclude the government's common law right to recover the money. *Collins v. Donovan,* 661 F.2d at 706.

The result of San Francisco's violation was an actual loss to the Federal Treasury. The use of food stamps as a welfare shifting measure in San Francisco's overall welfare benefits package meant that food stamp recipients paid less for their food stamps than they would have paid absent the violation. In upholding a recoupment regulation as an administrative tool designed to assure a fair distribution of limited funds, the court in *Jacquet* commented:

> If some welfare recipients obtain more than their rightful share of these finite resources through fraud, it is mathematically certain that other needy, dependent children whose families accurately reported their income and resources must be affected .... The recoupment regulations (are) an administrative tool designed to assure a fair distribution of the state's limited funds, ...

*Jacquet v. Westerfield,* 569 F.2d 1339, 1341 (5th Cir.1978).

We hold that when there has been a direct loss to the Federal Treasury, as here, the Secretary has the implied authority to recoup these losses funds by asserting a claim against the state. The statutory scheme and the integrity of the food stamp program would be unnecessarily compromised if the Secretary lacked the authority to recover damages caused by welfare shifting attempts of localities in violation of the plain condition of the Act.

For the reasons stated above, the federal government is entitled to collect from the state for damages incurred by San Francisco's illegal scheme.

## II.

## IS THE SECRETARY ESTOPPED FROM ASSERTING HIS CLAIM AGAINST THE STATE?

The state argues that the government is estopped from asserting its federal court claim because it failed to intervene in the state proceedings in *Long.*

On remand from the California Court of Appeal, the Superior Court established a distribution plan for payment of retroactive benefits to welfare recipients whose benefits had been improperly reduced under San Francisco's program. The court ordered San Francisco to set aside 3.5 million dollars as a retroactive benefit fund, and informed the USDA that it could make any claim it wished concerning its interest in the issues raised herein and the funds being distributed. In response to the order, the Assistant Attorney General informed the court that the Secretary of Agriculture would follow the claim procedures set forth in the Food Stamp Act. 7 U.S.C. 2022, 2023. These procedures allow the Secretary to determine the validity of its claims administratively, and provide for judicial review of this determination in federal district court.

In a subsequent order, dated August 10, 1979, the Superior Court ordered that the full amount of the retroactive benefit be paid to the welfare recipients. The court specifically noted that it did not intend to "assert jurisdiction over the federal govern-

ment or to determine the legality of any claims by the United States Department of Agriculture against the State of California and the City and County of San Francisco concerning the administration of food stamp program."

▮▮▮ The USDA's decision not to accept the Superior Court's invitation to intervene in *Long* did not estop the government from asserting its claim against the state through statutory channels. Absent affirmative misconduct, the United States may not be estopped from asserting its statutory rights. *Schweiker v. Hansen,* 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981).

We acknowledge that the efficient administration of justice might have been better served had the federal government intervened in *Long;* the Superior Court was capable of hearing the USDA's claim and ascertaining a proper amount of damages. As a result of the government's decision not to intervene, the Superior Court ordered that the full $42 payment be made to the GA recipients, even though they may have been entitled to a lesser amount after subtracting the figure which would have been collected by the federal government for increased food stamp costs.

The USDA's decision to assert its statutory right to bring an administrative claim against the state, followed by an opportunity for the state to obtain judicial review in federal court, does not constitute affirmative misconduct.

## III.

### WAS THE DISTRICT COURT'S ACCEPTANCE OF THE USDA ESTIMATE OF DAMAGES CLEARLY ERRONEOUS?

The state argues that the Department of Agriculture's calculation of its losses are overstated. The state contends that Agriculture's estimate of the monetary loss to the federal government is "faulty" because the agency failed to consider that if San Francisco raised the amount of the cash welfare payment landlords in the city would have raised rents, thus absorbing all or part of the increase.

▮▮▮ A court's award of damages is a finding of fact. *Miles v. District of Columbia,* 510 F.2d 188, 196 (D.C.Cir.1975). Appellate review of such a finding of fact is governed by the "clearly erroneous" standard. *Southern Pacific Transp. Co. v. City of Eugene,* 627 F.2d 966, 968 (9th Cir.1980). Fed.R.Civ.P. 52(a).

As noted by the district court, the problem with the state's argument is that it is not susceptible of proof. It is well-settled that mere speculation cannot be substituted for proof. *Noel v. United Aircraft Corp.,* 342 F.2d 232, 239 (3d Cir.1964). While one can speculate about how San Francisco's rental price structure might have changed due to an increase in GA payments to welfare recipients, as the Supreme Court noted in an antitrust case: "[n]ormally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different ..., he would have chosen a different price." *Hanover Shoe Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 492–93, 88 S.Ct. 2224, 2231, 20 L.Ed.2d 1231 (1968).

The state points to the Affidavit of Masaya Kakebe, the Assistant General Manager of the Department of Social Services of the City and County of San Francisco, as proof that when GA benefits go up, so do typical shelter costs. The state contends that this submission of "uncontroverted testimony" should have been deemed determinative.

▮▮▮ The fact that the government failed to investigate the state's theory in assessing the monetary damage caused by San Francisco's 10(d) violation did not require the trial court to resolve the issue in favor of the state. *See Lakewood Manufacturing Co. v. Commissioner of Internal Revenue,* 453 F.2d 451, 454 (6th Cir.1972) (government failure to call witness to rebut taxpayer's testimony did not require tax court to resolve issue in favor of taxpayer). Substantial evidence cannot be based upon an inference drawn from facts which are uncertain or speculative and which raise only a conjecture or a possibility. *Omaha Indian Tribe, Treaty of 1854, Etc. v. Wilson,*

575 F.2d 620, 642 (8th Cir.1978), *vacated* on other grounds, 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979). The affidavit contained little more than Kakebe's conclusion that a relationship between income and shelter costs exists; nowhere in this affidavit, or anywhere else in the record, is there any evidence as to how much shelter costs should go up per dollar of additional income. Furthermore, where the testimony of a disinterested witness is not directly contradicted, but such testimony is clouded with uncertainty, the trier of fact is not bound to accept it. 30 Am.Jur.2d *Evidence,* § 1083 at 234–35 (1967). Here, we have been presented with the testimony of an *interested* witness, who was an employee of the City and County of San Francisco.

The trial court's conclusion that the damages were supported by the evidence was not clearly erroneous. For the reasons stated above, we affirm.